William J. **MACKIN**, Plaintiff,

v.

John T. **AUBERGER**, Joseph T. **Loszynski**, and others known or unknown, Defendants.

No. 13–CV–6216 EAW.

United States District Court, W.D. New York.

Signed Nov. 7, 2014.

Jeffrey Wicks, Jeffrey Wicks, PLLC, Rochester, NY, for Plaintiff.

Paul J. Sweeney, Coughlin & Gerhart, LLP, Binghamton, NY, for Defendants.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, District Judge.

### INTRODUCTION

Plaintiff William J. Mackin ("Plaintiff" or "Mackin") brings this action against John T. Auberger ("Auberger") and Joseph F. Loszynski ("Loszynski") (collectively "Defendants"), alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* (Dkt. 11). Defendants have filed a motion to dismiss the amended complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). (Dkt. 13).

With this lawsuit, Plaintiff has attempted to transform an employment and political dispute into a federal racketeering case. Plaintiff's tactics offend RICO's intended purpose and do not withstand scrutiny under Rule 12(b)(6). Because Plaintiff's amended complaint fails to state a plausible RICO claim, Defendants' motion is granted and the amended complaint is dismissed in its entirety.

## BACKGROUND

Plaintiff, the former Deputy Chief of the Greece Police Department ("GPD"), alleges that Defendants Auberger, the former Supervisor of the Town of Greece, and Loszynski, the former Public Safety Director of the Town of Greece, committed RICO violations to bring about "the demise of the then-existing structure of the GPD." (Dkt. 4 at ¶ 5(g)). Plaintiff alleges that the racketeering activities "began in or around 2002 by Auberger and continued throughout 2009 when Loszynski was hired and beyond." (Dkt. 11 at ¶ 14). The latest predicate act cited by Plaintiff in his amended complaint allegedly occurred on July 28, 2010. (*Id.* at ¶¶ 35, 52–53). The statement of facts that follows is based on the allegations contained in Plaintiff's amended complaint.

## I. Plaintiffs Amended Complaint

In 2002, Plaintiff was Captain of the GPD. (*Id.* at ¶ 15). At that time, Plaintiff and three other officers sent a letter to the Monroe County Sheriff's Department requesting a promotional exam for the position of Deputy Chief. (*Id.* at ¶ 17). Plaintiff alleges that Auberger called the applicants, including Plaintiff, into his office and demanded that they withdraw their requests for promotional exams, as he wanted his own candidate, Michael Ceretto, to fill the Deputy Chief position. (*Id.*). Plaintiff refused to withdraw the

letter, and the promotional exam was held. (*Id.* at ¶ 18). Plaintiff and the other officers took and passed the exam in March 2002. (*Id.* at ¶ 19). An "open competitive exam" also was given, and Ceretto, Auberger's candidate, scored second highest on that exam. (*Id.*). Plaintiff alleges that New York law required Auberger to select the Deputy Chief from the promotional list before selecting a candidate from the open competitive list. (*Id.* at ¶ 20).

Sometime in or around July 2002, Auberger allegedly summoned Merritt Rahn, Chief of the GPD, to his home. (*Id.*). Plaintiff alleges that the meeting took place in a "highly coercive atmosphere." (*Id.*). Auberger demanded that Rahn instruct Plaintiff to "sign off," or remove himself from the Deputy Chief list so that he could make Ceretto the Deputy Chief. (*Id.* at ¶ 21). Plaintiff alleges that "[i]n exchange for Rahn's doing so, Auberger clearly made a threat—either directly or impliedly—that if Rahn did not do so, he would lose his job as he knows it, i.e., the conditions and authority of his employment, and such conditions and authority may be taken over from him by Auberger." (*Id.*). Plaintiff further alleges that Rahn "clearly received value and benefit" by complying with Auberger's orders, and that the interaction between Auberger and Rahn constituted the crime of "bribery, in violation of New York Penal Law section 200.00 and 18 U.S.C. section 1961(1)." (*Id.*).

Rahn reluctantly told Plaintiff to remove himself from the Deputy Chief list, but Plaintiff refused to do so. (*Id.* at ¶ 22). Auberger continued to pursue Rahn to pressure Plaintiff to remove himself from the Deputy Chief list. (*Id.* at ¶ 23). Rahn also informed Plaintiff that Auberger made Plaintiff "a marked man," that Auberger "hate[d]" Plaintiff, and that Auberger was "out to get" Plaintiff. (*Id.*).

As a result of Auberger's actions, Plaintiff discussed with Rahn the possibility of arresting Auberger for coercion and official misconduct. (*Id.* at ¶ 24). Plaintiff also consulted the then-Monroe County District Attorney, Howard Relin ("Relin"), to discuss Auberger's actions. (*Id.* at ¶ 25). Relin advised Plaintiff against arresting Auberger due to the disorder it would cause in the Town of Greece. (*Id.*). Plaintiff followed Relin's advice. (*Id.*).

Auberger ultimately hired Plaintiff for the Deputy Chief position. (*Id.* at ¶ 26). Plaintiff alleges that Auberger hired him "solely for the purpose of doing him harm and punishing him," and did so by reducing his salary, depriving him of a secretary, restricting Plaintiff's use of his official GPD police vehicle, and not allowing him to be present during the interviews of prospective hires. (*Id.* at ¶¶ 26–27). Plaintiff alleges that, by depriving him of these benefits, "Auberger instilled a fear in Mackin through Rahn that if Mackin did not give up the aforementioned benefits, i.e. property, injury may come to Mackin or someone else...." (*Id.* at ¶ 28). Plaintiff alleges that Auberger's conduct constituted the "crime of extortion, in violation of New York Penal Law section 155(2)(e) and 18 U.S.C. section 1961(1)" because Auberger "wrongfully took or with[held] the aforementioned benefits and property from an owner, i.e. Mackin." (*Id.*).

In or around May 2009, Loszynski, a former state police deputy superintendent for internal affairs, was hired by Auberger as the Director of Public Safety. (*Id.* at ¶¶ 31–32). Plaintiff alleges that Loszynski was hired "to effect, continue, strengthen and further Auberger's dominion and control over the GPD," and that Loszynski served as Auberger's "bulldog." (*Id.* at ¶¶ 33–34). For example, in late 2009, Loszynski allegedly told GPD officers that if they ever brought up Auberger's name

in connection with any wrongdoing, they would be terminated, and their benefits would be curtailed or ended. (*Id.* at ¶ 34). Plaintiff alleges that Loszynski's threats "constituted the crime of extortion, in violation of New York Penal Law section 155(2)(e) and 18 U.S.C. section 1961(1), since by the aforementioned acts, Auberger and Loszynski wrongfully threatened to take or withhold the aforementioned benefits and property from an owner...." (*Id.*).

Plaintiff further alleges that he was wrongfully accused of shredding subpoenaed documents. On Saturday, April 25, 2009, Plaintiff was shredding daily reports which were "completely unrelated to any subpoena ... issued by the Monroe County District Attorney's Office...." (*Id.* at ¶¶ 54–55). The shredding was "an innocuous act which was part of Mackin's daily routine every day for years," and the documents being shredded were "personal copies, not originals, and had been in Mackin's filing cabinet since approximately 1997." (*Id.* at ¶ 55). Sergeant Richard Downs allegedly heard Plaintiff's shredder and inaccurately concluded that Plaintiff was shredding subpoenaed documents named in a subpoena issued by the Monroe County District Attorney's office on the previous day. (*Id.* at ¶ 57). Downs contacted Lieutenant Patrick Phelan and Lieutenant Steve Chatterton with this information, and either Phelan or Chatterton contacted the New York State Police. (*Id.* at ¶ 58).

Plaintiff alleges that on April 26, 2009, at 2:30 a.m., he was awakened by a phone call to his department-issued cell phone from Lieutenant Steve Wise, who asked Plaintiff to come to the front door of his home. (*Id.* at ¶ 59). Wise informed Plaintiff that he was being suspended, and he was to turn over his vehicle, badge, gun, and computer. (*Id.* at ¶ 60). Wise did not offer an explanation as to why Plaintiff

was being suspended. (*Id.*). As Plaintiff was complying with Wise's orders, he received a phone call from Rahn, who also had been suspended. (*Id.* at ¶ 61).

Plaintiff further alleges that on Sunday, April 26, 2009, at 12:00 p.m., only hours after he had been suspended, the Greece Town Board ("Town Board") was called to an emergency meeting. (*Id.* at ¶ 63). Auberger told board members that Plaintiff, Rahn, and Sergeant Brian Ball ("Ball") were being suspended, based on charges drafted by Loszynski. (*Id.*). The Town Board allegedly was not given any reason for the suspensions because the investigation was confidential. (*Id.* at ¶¶ 63–64). The Town Board "reluctantly" voted to approve the suspensions at 1:00 p.m. that day. (*Id.* at ¶ 64).

Plaintiff alleges that Auberger's telling the Town Board that Plaintiff, Rahn, and Ball were being suspended, and that the investigation was confidential and that no information could be disclosed, constituted "a threat to the Board—delivered by the *de facto* head of the Republican Party— that it would not benefit from the backing of the Republican Party if it did not vote as he instructed." (*Id.* at ¶ 66). Plaintiff further alleges that Auberger previously told individuals with positions of power in Greece that if they did not follow his instructions, that "they would be out." (*Id.* at ¶ 67). Plaintiff alleges that Auberger's "message" to the Town Board on April 26, 2009, was "do as I tell you, or you're out and you receive no political support from me." (*Id.* at ¶ 68). Plaintiff alleges that Auberger's actions constituted bribery of the Town Board, in violation of the New York Penal Law § 200.00 and 18 U.S.C. § 1961(1). (*Id.*). Plaintiff also alleges that by seeking to improperly influence the Town Board, Auberger and Loszynski committed obstruction of criminal investi-

gations, in violation of 18 U.S.C. § 1510. (*Id.* at ¶ 69).

Plaintiff retained attorney John F. Speranza ("Speranza") soon after he was suspended. (*Id.* at ¶ 74). Prior to charges being filed, Plaintiff was allegedly forced to give "compelled testimony" while in the presence of Speranza, but Speranza was not permitted to act on Plaintiffs behalf. (*Id.* at ¶ 75).

Plaintiff alleges that he was "kept in the dark" regarding the reason for his suspension and the nature of the charges until June 24, 2009, when 36 charges were filed and served against him. (*Id.* at ¶¶ 70–71). The charges included failing to perform various official functions relating to the case of Sergeant Nicholas Joseph, who had a well-publicized motor vehicle accident in June 2008, followed by criminal charges and a conviction after trial; impeding investigations by shredding official documents of the Town of Greece; aiding and abetting Rahn in covering up facts regarding Rahn's missing GPD-issued weapon; and violating GPD rules and regulations by directing Sergeant Richard Downs to speak to a private investigator assisting in the defense of GPD officer Gary Pignato, who was arrested, tried, and convicted after allegedly sexually groping a woman while on duty as an officer. (*Id.* at ¶ 72). Plaintiff alleges that all of these charges are "untrue and falsely made, drafted and authored." (*Id.* at ¶ 73).

Plaintiff alleges that Speranza submitted an answer to the charges on June 30, 2009, and an amended answer on July 17, 2009, with defenses, including that the charges and specifications against Plaintiff were illegal and unlawful, as the board members did not read, consider, or otherwise deliberate on the charges, and that the vote by the Town Board was not a free exercise of each member's voting authority. (*Id.* at ¶¶ 76–77).

Following service of the charges, Plaintiff was suspended without pay. (*Id.* at ¶ 78). Plaintiff alleges that, while he had a right to a hearing, he decided to retire because defense of the charges would have been lengthy and expensive, and an emotional strain on him and his family. (*Id.* at ¶ 79). The Town Board voted on the charges against Plaintiff on June 24, 2009. (*Id.* at ¶ 80). Plaintiff alleges that Auberger again pressured the Town Board to vote in favor of the charges and therefore bribed the Town Board, in violation of New York Penal Law § 200.00 and 18 U.S.C. § 1961(1). (*Id.*). Plaintiff also alleges that by seeking to improperly influence the Town Board, Auberger and Loszynski committed obstruction of criminal investigations, in violation of 18 U.S.C. § 1510. (*Id.* at ¶ 81).

Plaintiff further alleges that on July 28, 2010, Auberger authorized the release of the "Loszynski Report," a report on an investigation of the GPD, which was written and authored by Loszynski at the direction of Auberger. (*Id.* at ¶ 35). The report was the product of Loszynski's April 2010 internal investigation of the GPD. (*Id.* at ¶ 36). Plaintiff alleges that the investigation occurred at a time when Auberger was running a "hotly contested" reelection campaign for Town Supervisor. (*Id.* at ¶ 37). Plaintiff alleges that the report, while largely uncritical of the political leadership in Greece, "cleared Auberger of wrongdoing while attributing responsibility for any and all alleged misconduct to GPD officers, including most particularly Rahn." (*Id.* at ¶ 39). Plaintiff alleges that the investigation cost taxpayers over $900,000. (*Id.* at ¶ 40). The report stated that several senior GPD officers had engaged in misconduct by deceiving town officials, "holding them at arm's length, fabricating background investigation materials, nurturing a culture of cronyism at the top,

and intimidating subordinates who were willing to go along to get along." (*Id.* at ¶¶ 42–43). Plaintiff alleges that. the Loszynski Report was inaccurate in this respect, as Auberger was intimately involved in GPD business, often "encroaching" upon what would be the activities of the Chief of Police, such as hiring, promotion, discipline, and firing decisions. (*Id.* at ¶¶ 45–46). Plaintiff alleges one instance where he was pressured by Auberger to hire an individual named Gary Pignato for a position with the police department, and Auberger allegedly ordered alterations to Pignato's background investigation. (*Id.* at ¶¶ 47–48).

Plaintiff alleges that the following statements in the Loszynski Report are false: GPD personnel wrongly shredded subpoenaed documents; a senior GPD officer had his service weapon stolen from his unlocked patrol vehicle parked at his residence; two GPD officers used official vehicles for out-of-state personal trips, and one used a town credit card to purchase gas for that trip; there was systematic abuse of the overtime program by some members of the GPD; and a senior GPD officer failed to comply with the conditions stipulated in a memorandum of understanding pertaining to the GPD's participation in a military surplus program with respect to accountability, usage, and disposition of the property acquired under this program. (*Id.* at ¶¶ 50–51). Plaintiff alleges that the Loszynski Report, having been mailed to the public and displayed on the internet, constituted repeated mail fraud, pursuant to 18 U.S.C. § 1341, and repeated wire fraud, pursuant to 18 U.S.C. § 1343. (*Id.* at ¶¶ 52–53).

## II. Procedural History

Plaintiff filed his complaint on April 26, 2013, alleging violations of 18 U.S.C. § 1962(c) (RICO's substantive provision)

and 18 U.S.C. § 1962(d) (RICO's conspiracy provision). (Dkt. 1). Plaintiff subsequently filed a RICO case statement as required by L.R. Civ. P. 9, on August 30, 2013. (Dkt. 4). Defendants moved to dismiss the complaint on September 11, 2013. (Dkt. 6). This motion was withdrawn due to Plaintiffs filing of an amended complaint on October 2, 2013. (Dkt. 11 and 12). Defendant Auberger filed a motion to dismiss the amended complaint on October 23, 2013, and the motion was amended to include Defendant Loszynski as a movant on October 31, 2013. (Dkt. 13 and 16). The case was transferred to the undersigned on January 15, 2014. (Dkt. 18). Plaintiff filed a response to the motion to dismiss on March 17, 2014, and Defendants filed a reply on March 27, 2014. (Dkt. 21 and 22). Oral argument was held on May 29, 2014. (Dkt. 24).

## DISCUSSION

### I. Legal Standard

#### A. Defendants' Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1)

Defendants bring this motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim, and pursuant to Fed.R.Civ.P. 12(b)(1), for lack of subject matter jurisdiction. (Dkt. 13). Defendants argue that dismissal is appropriate under Fed.R.Civ.P. 12(b)(1) because Plaintiff has not alleged RICO standing. (Dkt. 13–2 at 24).

▇▇▇▇ Although Defendants move under Rule 12(b)(1) to dismiss Plaintiff's claims for lack of RICO standing, "RICO standing is not jurisdictional, and therefore ... a court has original jurisdiction over a RICO claim even if plaintiffs lack standing under the RICO statute." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir.2006). As the Second Circuit Court of Appeals explained in *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir.2003):

[D]espite describing the proximate causation requirement as "RICO standing," such standing is not jurisdictional in nature under Fed.R.Civ.P. 12(b)(1), but is rather an element of the merits addressed under a Fed.R.Civ.P. 12(b)(6) motion for failure to state a claim. RICO standing is sufficiently intertwined with the merits of the action, such that its determination requires an evaluation of the merits of the action and makes any potential distinction between the merits and RICO standing exceedingly artificial.

*Id.* at 129–30; *see also Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 55 (2d Cir. 2004) (order of dismissal of plaintiff's RICO claims for lack of standing was "on the merits rather than for lack of subject-matter jurisdiction."); *DeSilva v. N. Shore–Long Island Jewish Health Sys.*, 770 F.Supp.2d 497, 519 (E.D.N.Y.2011) (" 'Standing' under RICO, for purposes of a motion to dismiss, is not a jurisdictional concept, but instead is analyzed as a merits issue under Federal Rule of Civil Procedure 12(b)(6)."); *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 726 F.Supp.2d 225, 236 n. 9 (E.D.N.Y.2010) ("The Court's dismissal of DLJ's RICO claims for lack of statutory standing, as set forth infra, is therefore pursuant to Rule 12(b)(6), not Rule 12(b)(1)."). Therefore, the Court evaluates Defendants' RICO standing argument as a determination on the merits pursuant to Fed. R. Civ P. 12(b)(6), rather than a jurisdictional determination under Fed.R.Civ.P. 12(b)(1).

#### B. Defendants' Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6)

" 'In considering a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhib-

its or incorporated in the complaint by reference.'" *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir.1996) (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)). A court should consider the motion "accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir.2008) (internal quotations and citation omitted). To withstand dismissal, a plaintiff must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir.2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (alteration in original) (internal quotations and citations omitted). Thus, "at a bare minimum, the operative standard requires the plaintiff [to] provide the grounds upon which his claim rests through factual allegations sufficient · to raise a right to relief above the speculative level." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir.2008) (alteration in original) (internal quotations and citations omitted).

## II. Plaintiff's RICO Case Statement

As an initial matter, the Court notes that Plaintiff's RICO case statement was not filed until August 30, 2013, more than four months after the filing of the original complaint on April 26, 2013. (Dkt. 1 and 4). L.R. Civ. P. 9 requires that the case statement "shall be filed contemporaneously with the papers first asserting the party's RICO claim, cross-claim or counterclaim, unless the Court grants an extension of time for filing." L.R. Civ. P. 9. Although the failure to file a RICO case statement may result in dismissal, *see id.*, Defendants have neither raised this issue in their motion to dismiss, nor moved to strike the RICO case statement as untimely.

Plaintiff's RICO case statement is hardly a model of clarity, and Plaintiff, for the most part, merely reiterates the statements contained in the amended complaint. In the case statement, Plaintiff states that the alleged RICO enterprise at issue was an "association in fact" comprised of Auberger and Loszynski. (Dkt. 4 at ¶¶ 6(a) and (c)). Plaintiff alleges that the purpose of the enterprise was "the demise of the then-existing structure of the GPD." (*Id.* at (b)).

Plaintiff's RICO case statement also contains allegations relating to an alleged bribery that is not contained in his amended complaint as a predicate act. Specifically, the RICO case statement states as follows:

In or around June 2009, Auberger aided Loszynski in entering into an Agreement with Alliance Court Reporting wherein Alliance was not allowed to provide Mackin's attorney with copies of the transcripts of prior compelled testimony, but provided a copy of the same to Loszynski, who utilized the same in further and continued compelled statements. By doing so, Loszynski, with the aid of Auberger, committed the crime of bribery, in violation of the New York

Penal Law Article 200 and 18 U.S.C. section 1961(1).

(*Id.* at ¶ 2(e)). Plaintiff also states, in a conclusory fashion, that Defendants are separate from the enterprise, and that the pattern of racketeering activity and the enterprise are separate. (*Id.* at ¶¶ 6(e), 7).

■ The Local Rule mandating the provision of a RICO case statement does not state that a case statement may be treated as part of the allegations in the complaint. *See* L.R. Civ. P. 9. However, the Second Circuit Court of Appeals directs that a RICO case statement should be read together with a complaint on a motion to dismiss. *McLaughlin v. Anderson,* 962 F.2d 187, 189 (2d Cir.1992); *see also Baxter v. A.R. Baron & Co.,* Fed. Sec. L. Rep. (CCH) P99,351, 1996 WL 586338, at *12, 1996 U.S. Dist. LEXIS 15098, at *34 (S.D.N.Y.1996) (dismissing defendants' argument that the plaintiffs failed to plead two or more predicate acts because the plaintiffs' RICO statement "contains no less than ten alleged predicate acts...."). Accordingly, the Court will consider the predicate act involving Alliance Court Reporting even though it is not alleged in the amended complaint, and it will consider the RICO case statement as supplementing Plaintiff's amended complaint.

## III. Elements of a Civil RICO Claim

■ A plaintiff's burden is high when pleading RICO allegations as "[c]ourts look with particular scrutiny at claims for a civil RICO, given RICO's damaging effects on the reputations of individuals al-

leged to be engaged in RICO enterprises and conspiracies." *Spiteri v. Russo,* No. 12–CV–2780 (MKB)(RLM), 2013 WL 4806960, at *45, 2013 U.S. Dist. LEXIS 128379, at *173 (E.D.N.Y. Sept. 7, 2013); *see also Purchase Real Estate Grp., Inc. v. Jones,* No. 05 Civ. 10859, 2010 WL 3377504, at *6, 2010 U.S. Dist. LEXIS 87571, at *17–18 (S.D.N.Y. Aug. 24, 2010) ("courts should look 'with particular scrutiny' at civil RICO claims to ensure that the RICO statute is used for the purposes intended by Congress.") (citing *Goldfine v. Sichenzia,* 118 F.Supp.2d 392, 397 (S.D.N.Y.2000)).

■■ Plaintiff alleges violations of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d). Section 1962(c) states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). To state a substantive RICO claim, a plaintiff must plead, "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce."[1] *Moss v. Morgan Stanley, Inc.,*

---

**1.** Although not addressed in this Decision and Order, namely because the argument was not raised by Defendants, the Court is doubtful as to whether Plaintiff has adequately alleged that the activities of the enterprise had an effect on interstate commerce. "In this Circuit ... RICO plaintiffs may satisfy this element by showing only 'a minimal effect on interstate commerce.'" *First Capital Asset*

*Mgmt. v. Satinwood, Inc.,* 385 F.3d 159, 173 n. 12 (2d Cir.2004) (quoting *De Falco v. Bernas,* 244 F.3d 286, 309 (2d Cir.2001)). In his RICO case statement, Plaintiff states that the activities of the alleged enterprise affected interstate commerce "in that criminal matters investigated by the GPD and Public Safety, e.g., crimes involving drugs, firearms, kidnapping, etc., are interstate commerce" and

719 F.2d 5, 17 (2d Cir.1983) (citing 18 U.S.C. §§ 1962(a)-(c)). Section 1962(d) makes it unlawful for any person to conspire to violate the substantive provisions of RICO, including § 1962(c). The Court considers each of Plaintiff's RICO claims below.

## IV. RICO Enterprise

In his RICO case statement, Plaintiff alleges that the enterprise in this case is an "association in fact" enterprise, comprised of Auberger and Loszynski. (Dkt. 4 at ¶¶ 6(a) and (c)). Alleging a RICO enterprise is generally not a high threshold, but it is a required element of a cause of action under § 1962(c). Notwithstanding the relatively low hurdle, Plaintiff has failed to allege a plausible enterprise.

### A. Association–in–Fact Enterprise

 A RICO enterprise is not required to have business-like characteristics such as "a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Boyle v. United States*, 556 U.S. 938, 948, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). " '[F]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes.' " *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir.2004) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 820 F.Supp. 89, 98 (S.D.N.Y.1993)). The threshold for pleading an association-in-fact enterprise established by the United States Supreme

Court in *Boyle* is low, and requires only " 'a group of [entities] associated together for a common purpose of engaging in a course of conduct ... pleading a 'hierarchical structure' or a 'chain of command' is not necessary.' " *McGee v. State Farm Mut. Auto. Ins. Co.*, No. 08–CV–392(FB)(CLP), 2009 WL 2132439, at *4 n. 7, 2009 U.S. Dist. LEXIS 60229, at *14 n. 7 (E.D.N.Y. July 14, 2009) (quoting *Boyle*, 556 U.S. at 946, 129 S.Ct. 2237) (alteration in original). RICO's enterprise concept is "narrower than that of other federal laws, and ... proof of a pattern of racketeering activity may be sufficient in a particular case to permit an inference of the enterprise's existence." *State Farm Mut. Auto. Ins. Co. v. Cohan*, No. CV 09–2990(JS)(WDW), 2009 U.S. Dist. LEXIS 125653, at *21 (E.D.N.Y. Dec. 30, 2009). In the case of an "association-in-fact" enterprise, it "is oftentimes more readily proven by what it *does*, rather than by abstract analysis of its structure." *United States v. Krasniqi*, 555 Fed.Appx. 14, 17 (2d Cir.2014), *cert. denied*, ─── U.S. ───, 135 S.Ct. 294, 190 L.Ed.2d 214 (2014) (emphasis in original) (internal quotations and citation omitted); *see also United States v. Mazzei*, 700 F.2d 85, 91 (2d Cir.1983) (group of individuals who shared the common purpose of influencing, through bribery, the outcome of college basketball games to secure a profit constituted an enterprise).

 Here, Plaintiff alleges one enterprise in his RICO case statement. (Dkt. 4 at ¶ 6). He identifies two individuals, Auberger and Loszynski, as the persons allegedly constituting the enterprise. (*Id.* at

"many of the investigations involved suspects who resided or were located out-of-state." (Dkt. 4 at ¶ 10). Plaintiff's explanation of how the activities of the enterprise affected interstate commerce is unclear and conclusory. Furthermore, while the GPD may investigate crimes involving the movement of goods

or people in interstate commerce, it does not necessarily follow that an alleged RICO enterprise with the goal of destroying the GPD affects interstate commerce. This is not a case where the alleged enterprise itself is involved in drug trafficking, firearms trafficking, or kidnapping.

(a)). Plaintiff further alleges that the structure and purpose of the enterprise was "that Auberger, having complete control, including hiring control of not only the Town, the Town Board, but in particular, the GPD, put in place persons in positions of authority, the **purpose** for which was the demise of the then-existing structure of the GPD." (*Id.* at (b)) (emphasis in original).

■ These allegations do not adequately allege an association-in-fact enterprise. Loszynski did not participate in the alleged RICO violations occurring before 2009, as he was not hired until in or around May 2009. (Dkt. 11 at ¶ 3). Accordingly, despite the plethora of allegations in the amended complaint related to events prior to May 2009 (*id.* at ¶¶ 21–30), the alleged enterprise existing prior to that date consisted of a single person, Auberger. An association in fact, by its very name and meaning, contemplates an "association" of individuals, not one individual. *See United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (stating that an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct.") (emphasis added); *Cruz v. FXDirectDealer, LLC,* 720 F.3d 115, 121 (2d Cir.2013) ("Finally and obviously, neither Tradition nor FXDD standing alone can constitute an enterprise as an 'association in fact.' "); *United States v. Perholtz,* 842 F.2d 343, 353 (D.C.Cir. 1988) ("The indictment did not allege that Perholtz associated with himself, but that he associated with others. That is the very meaning of an *association-in-fact.*") (emphasis in original); *Elsevier, Inc. v. Grossman,* No. 12 Civ. 5121(KPF), 2013 WL 6331839, at *8, 2013 U.S. Dist. LEXIS 171701, at *24 (S.D.N.Y. Dec. 5, 2013) (a required feature of an association-in-fact enterprise is that it has "relationships among the individuals associated with the enterprise . . . .") (emphasis added); *Rosenson v. Mordowitz,* No. 11 Civ. 6145(JPO), 2012 WL 3631308, at *10, 2012 U.S. Dist. LEXIS 120077, at *32 (S.D.N.Y. Aug. 23, 2012) ("The crucial aspect of these association-in-fact entities, however, is that they must have more than one member to operate as a RICO enterprise."). By definition, an association in fact did not exist prior to May 2009. Plaintiff has alleged the association in fact to consist of Auberger *and* Loszynski. (Dkt. 4 at ¶ 6(a)). As a result, by virtue of Plaintiff's own allegations, it is not possible for the alleged enterprise to have existed prior to May 2009.

Furthermore, even just considering Plaintiff's allegations concerning an alleged enterprise that existed once Loszynski was hired, that is, May 2009 and later, it is questionable whether Plaintiff has met his pleading standard. While Plaintiff alleges that Loszynski was hired as Auberger's "bulldog" and used to "strengthen and further Auberger's dominion and control over the GPD" (Dkt. 11 at ¶ 34), Plaintiff fails to allege that Auberger and Loszynski had a common or shared purpose or that they functioned as a continuing unit. *See Hoatson v. N.Y. Archdiocese,* No. 05 Civ. 10467(PAC), 2007 WL 431098, at *3, 2007 U.S. Dist. LEXIS 9406, at *10 (S.D.N.Y. Feb. 8, 2007), *aff'd,* 280 Fed. Appx. 88 (2d Cir.2008) (dismissing plaintiff's RICO claim and noting that beyond conclusory allegations, plaintiff did not allege facts that the defendants functioned as a continuing unit). Here, Plaintiff's factual allegations concerning the enterprise focus solely on Auberger's alleged motive and purpose. (Dkt. 4 at ¶ 6). Nonetheless, the Court need not resolve this issue because the Court concludes that Plaintiff's enterprise allegations fail for the other reasons discussed below.

## B. Distinguishing Between the Alleged Enterprise and the Racketeering Activity

Defendants argue that Plaintiff has not alleged a distinction between the RICO enterprise and the RICO activities. (Dkt. 13–2 at 22). In *Turkette*, 452 U.S. 576, 101 S.Ct. 2524, the United States Supreme Court explained that the alleged enterprise must be distinct from the racketeering activity:

The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

*Id.* at 583, 101 S.Ct. 2524 (internal citation omitted). Accordingly, "[i]n assessing whether an alleged enterprise has an ascertainable structure distinct from that inherent in a pattern of racketeering, it is appropriate to consider whether the enterprise would still exist were the predicate acts removed from the equation." *Wood v. Inc. Vill. of Patchogue of New York*, 311 F.Supp.2d 344, 357 (E.D.N.Y.2004) (internal quotations and citation omitted); *see also Black Radio Network, Inc. v. NYNEX Corp.*, 44 F.Supp.2d 565, 580 (S.D.N.Y. 1999) ("Plaintiffs have failed to adequately allege the existence of an enterprise for purposes of § 1962(c), for they have failed to allege an enterprise that is separate and distinct from the alleged pattern of racketeering activity."). While it may be that "the evidence necessary to prove [an enterprise and racketeering activity] ... in some cases may overlap or coalesce," they remain separate elements "that must be alleged separately in a well-pleaded RICO complaint...." *United States v. Int'l Longshoremen's Ass'n*, 518 F.Supp.2d 422, 473 (E.D.N.Y.2007); *see also Delgado v. Ocwen Loan Servicing, LLC*, No. 13–CV–4427 (NGG)(RML), 2014 WL 4773991, at *16, 2014 U.S. Dist. LEXIS 135758, at *48 (E.D.N.Y. Sept. 24, 2014) (noting that although the pattern of racketeering activity is a separate and distinct element from the enterprise itself, the evidence used to prove both elements may in particular cases coalesce).

In *Hoatson v. N.Y. Archdiocese*, the plaintiff employee alleged RICO violations against the defendants, clergymen and dioceses, who allegedly fired him for exposing sexual abuse by clergymen. The plaintiff alleged that the relationship between the defendants was an association in fact; the defendants constituted an enterprise which engaged in two or more predicate acts; and the enterprise had the scheme to protect, hide, and move sexually abusive priests. 2007 WL 431098, at *3, 2007 U.S. Dist. LEXIS 9406, at *9–10. The court found that these allegations failed to state the existence of a viable enterprise, explaining as follows:

Beyond these wholly conclusory allegations, Plaintiff does not allege any facts that the defendants ... were "an entity separate and apart" from their alleged

illegal activities. Rather, it appears that this group of Defendants has been grouped together for the sole reason that they all allegedly had a hand in Plaintiff's termination. The "enterprise," however, must exist and function separately from the alleged illegal acts, and Plaintiff has failed to assert that. There are simply no facts whatsoever to support Plaintiff's conclusory allegation that any "enterprise," as defined by RICO, existed.

*Id.* at *3, 2007 U.S. Dist. LEXIS 9406, at *10.

Furthermore, in *Kaye v. City of Milwaukee*, No. 05–C–0982, 2006 U.S. Dist. LEXIS 47714 (E.D.Wis. July 11, 2006), the court found that the plaintiff, who alleged that the City denied him the opportunity to buy and develop city-owned real estate, did not properly allege the existence of an enterprise. *Id.* at *18. In his complaint and RICO statement, plaintiff alleged that the pattern of racketeering activity and the enterprise were separate, and that the purpose of the enterprise was to "control the real estate decisions and use that control for personal benefit," and that the pattern of racketeering activity was "all the acts [the defendants] ... have been taking to achieve and exploit the power of public, and quasi public, office." *Id.* at *20. The court noted that the plaintiff's alleged association-in-fact enterprise was insufficient to satisfy RICO's enterprise requirement because he "improperly ple[d] the existence of an enterprise by describing the enterprise's alleged purpose rather than its structure, duration, or organization." *Id.* at *22. In other words, the plaintiff failed to allege facts supporting the notion that the enterprise was separate from the racketeering activity. The plaintiff's RICO claims were dismissed.

Here, Plaintiff does not allege facts supporting his conclusory assertion that "[t]he pattern of racketeering activity and the enterprise are separate." (Dkt. 4 at ¶ 7). To the contrary, Plaintiff alleges that Auberger hired Loszynski to serve as his "bulldog," to "use him to strengthen and further Auberger's dominion and control over the GPD," which Auberger purportedly pursued through criminal acts. (Dkt. 11 at ¶ 34). In other words, according to Plaintiff, Auberger associated with Loszynski to perform criminal acts. Although Plaintiff states in a conclusory manner that the pattern of racketeering and the enterprise are separate, there are no facts alleged in the amended complaint that plausibly support this contention. As a result, the RICO enterprise as alleged by Plaintiff is not distinct from the racketeering activity.

**C. Distinguishing Between RICO "Persons" and a RICO "Enterprise"**

 Defendants also argue that Plaintiff does not distinguish between a RICO "person" and a RICO "enterprise." (Dkt. 13–2 at 22). A plaintiff alleging RICO violations must satisfy the "distinctiveness" requirement, by alleging the existence of two distinct entities: "(1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001). Plaintiff's complaint must allege facts supporting the separate existence of a RICO enterprise. *See Manax v. McNamara*, 660 F.Supp. 657, 662 (W.D.Tex.1987) (where plaintiffs alleged the existence of an association-in-fact enterprise, comprised of the mayor and other defendants who associated together to allegedly deprive plaintiff Manax of his medical license, plaintiffs' RICO claim was dismissed because it was "not clear how, or even if, the enterprise is separate from the

Defendants. . . . No facts are alleged which lend support to the separate existence of a RICO enterprise.").

In *Newkirk v. Vill. of Steger*, No. 02 C 9077, 2004 WL 2191589, 2004 U.S. Dist. LEXIS 19192 (N.D.Ill. Sept. 24, 2004), a case remarkably similar to the case at hand, the plaintiffs, members of the village police department, alleged that the village president, the chief of police, and other officers committed RICO violations against them for personal and political gain. *Id.* at *1–3, 2004 U.S. Dist. LEXIS 19192, at *1–7. The Court dismissed the RICO complaint for failure to adequately allege an enterprise. *Id.* at *14, 2004 U.S. Dist. LEXIS 19192, at *46. The court noted that the plaintiffs had failed to allege a separate enterprise entity in their complaint and, to the extent they alleged that the enterprise consisted of an association in fact of all the defendants, or merely the village and the police department, plaintiffs could not identify an enterprise distinct from the defendants themselves. *Id.*.

In his RICO case statement, Plaintiff alleges that Auberger had the goal of bringing about the demise of the then-existing structure of the GPD, including the forced exit of Mackin, Rahn, and others whom Auberger could not completely control. (Dkt. 4 at ¶ 6(b)). Plaintiff also states that the RICO enterprise is "Auberger and Loszynski." (*Id.* at (a)). Although Plaintiff states that Defendants are separate from the alleged enterprise (*id.* at (e)), Plaintiff's assertion in this respect is conclusory because the amended complaint does not allege facts supporting that the RICO persons (Auberger and Loszynski) are separate from the alleged enterprise (Auberger and Loszynski). In other words, the amended complaint is devoid of allegations that Auberger and Loszynski were people separate from a larger criminal enterprise. Because the RICO statute

" 'clearly envisions' that the 'person' and the 'enterprise' will be distinct," Plaintiff has failed to allege the existence of a RICO enterprise. *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir.1996) (citing *Bennett v. United States Trust Co.*, 770 F.2d 308, 315 (2d Cir.1985)).

 In short, "[p]laintiff is simply attempting to craft a claim under RICO based upon purely personal disputes. . . . '[C]ourts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb.' " *Daskal v. Tyrnauer*, No. 500734/11, 37 Misc.3d 1214(A), at *38, 2012 WL 5276925 (Sup.Ct. Kings Cnty. Oct. 22, 2012) (quoting *Nat'l Union Fire Ins. Co. v. Archway Ins. Servs., LLC*, No. 11 Civ. 1134(WHP), 2012 WL 1142285, at *3, 2012 U.S. Dist. LEXIS 48735, at *10 (S.D.N.Y. Mar. 23, 2012)).

## V. Predicate Acts

 In order to state a RICO violation, a plaintiff must also allege that the defendant or defendants committed the underlying substantive criminal law violations. *See MLSMK Invs. Co. v. JP Morgan Chase & Co.*, 737 F.Supp.2d 137, 142 (S.D.N.Y.2010), *aff'd in part*, 431 Fed. Appx. 17 (2d Cir.2011) ("If a party intends to allege that communications constitute predicate acts of mail or wire fraud, it must allege the following elements of those offenses . . . .") (internal quotations and citation omitted); *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F.Supp.2d 300, 310–11 (S.D.N.Y.2009) (listing elements of the underlying predicate acts, mail and wire fraud and bribery).

Plaintiff bases his predicate act allegations on the following: (1) extortion; (2) mail fraud; (3) wire fraud; (4) obstruction

of criminal investigations;[2] and (5) bribery. (Dkt. 4 at ¶¶ 2(a)-(f)). The alleged predicate acts are discussed below.

## A. Extortion

Plaintiff alleges that Auberger committed extortion when he hired Plaintiff for the position of Deputy Chief and imposed "impracticable, impossible and unfeasible" conditions on him, including not permitting Plaintiff to have a secretary, restricting the use of his police vehicle, and reducing his pay. (Dkt. 11 at ¶¶ 26–28). Plaintiff alleges that by taking these actions, Auberger "instilled a fear in Mackin through Rahn that if Mackin did not give up [these] ... benefits ... injury may come to Mackin or someone else...." (*Id.* at ¶ 28). Plaintiff also alleges that Defendants committed extortion in or around late 2009 (i.e. after Plaintiff was no longer employed), when Loszynski told GPD officers that if they ever mentioned Auberger's name in connection with any wrongdoing, they would be terminated, and their benefits would be curtailed or ended. (*Id.* at ¶ 34).

·As an initial matter, the alleged extortion by Auberger occurred at a time when Auberger was the only person engaged in the alleged enterprise. As discussed above, it is impossible for an association-in-fact enterprise to have existed during this time period, and therefore, by definition, Plaintiff's reliance upon alleged predicate acts occurring during this time period also must fail.

Moreover, even considering the alleged extortion that occurred prior to Loszynski's hiring, it is apparent that Plaintiff has failed to plead plausible acts of extortion. Plaintiff bases his extortion allegations on both federal and state law. Extortion as defined by the Hobbs Act is "*the obtaining of property from another*, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, under color of official right." 18 U.S.C. § 1951(b)(2) (emphasis added).[3] Under New York law, larceny by extortion is defined as follows:

A person obtains property by extortion when he *compels or induces another person to deliver such property to himself or to a third person* by means of instilling in him a fear that, if the property is not so delivered, the actor or another will:

(i) Cause physical injury to some person in the future; or

(ii) Cause damage to property; or

(iii) Engage in other conduct constituting a crime; or

---

**2.** At oral argument on May 29, 2014, Plaintiff withdrew his claims for obstruction of criminal investigations. (Dkt. 24 and 25 at 7, 16–17). Plaintiff based his obstruction of criminal investigations allegations on alleged violations of 18 U.S.C. § 1510 (Dkt. 11 at ¶¶ 69, 81). However, Plaintiff recognized that any such claims must involve a federal criminal investigator, which is defined as "any individual duly authorized by a department, agency, or armed force of the United States to conduct or engage in investigations of or prosecutions for violations of the criminal laws of the United States." 18 U.S.C. § 1510(c). Plaintiff does not allege that Defendants' alleged obstruction of criminal investigations was tied to a federal investigation, and the Greece Town Board is not a federal investiga-

tor. Instead, Plaintiff alleges that Defendants obstructed Town of Greece proceedings and investigations. As a result, Plaintiff's claims for obstruction of criminal investigations were properly withdrawn.

**3.** Plaintiff does not specifically identify in his amended complaint the section of federal law he claims was violated in relation to his extortion claim. However, pursuant to 18 U.S.C. § 1961(1), the only federal extortion statute qualifying as a predicate act under RICO is 18 U.S.C. § 1951. *See* 18 U.S.C. § 1961(1)(B). Therefore, the Court presumes that Plaintiff intends to allege a violation of 18 U.S.C. § 1951, relating to extortion.

(iv) Accuse some person of a crime or cause criminal charges to be instituted against him; or

(v) Expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule; or

(vi) Cause a strike, boycott or other collective labor group action injurious to some person's business ... or

(vii) Testify or provide information or withhold testimony or information with respect to another's legal claim or defense; or

(viii) Use or abuse his position as a public servant by performing some act within or related to his official duties, or by failing or refusing to perform an official duty, in such manner as to affect some person adversely; or

(ix) Perform any other act which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to his health, safety, business, calling, career, financial condition, reputation or personal relationships.

N.Y. Penal Law § 155.05(e) (emphasis added).[4] The property obtained through extortion may be intangible property. *United States v. Coppola*, 671 F.3d 220, 235 (2d Cir.2012), *cert. denied*, —— U.S. ——, 133 S.Ct. 843, 184 L.Ed.2d 653 (2013).

 It is well-settled that the extortion provision of the Hobbs Act requires " 'not only the deprivation but the acquisition of property.' " *Sekhar v. United States*, —— U.S. ——, 133 S.Ct. 2720, 2725, 186 L.Ed.2d 794 (2013) (quoting *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 404, 123 S.Ct. 1057, 154 L.Ed.2d 991

(2003)). Therefore, the operative question is "whether the defendants ... 'pursued [or] received something of value from [victims] that they could exercise, transfer, or sell.' " *United States v. Gotti*, 459 F.3d 296, 323 (2d Cir.2006) (quoting *Scheidler*, 537 U.S. at 405, 123 S.Ct. 1057) (alterations in original).

In *Scheidler*, the Supreme Court held that abortion protesters did not commit extortion as defined by the Hobbs Act even though they "interfered with, disrupted, and in some instances completely deprived" abortion clinics of their ability to run their business. *Scheidler*, 537 U.S. at 404–05, 123 S.Ct. 1057. The Supreme Court reasoned that while the protesters may have deprived the clinics of an alleged property right, the protesters did not receive "something of value from" the clinics that they could then "exercise, transfer, or sell" themselves. *Id.* at 405, 123 S.Ct. 1057. The Court explained that "[t]o conclude that such actions constituted extortion would effectively discard the statutory requirement that property must be obtained from another, replacing it instead with the notion that merely interfering with or depriving someone of property is sufficient to constitute extortion." *Id.* The Court also noted that "[t]he crime of coercion ... more accurately describes the nature of petitioners' actions," because coercion "involves the use of force or threat to restrict another's freedom of action." *Id.*

A decade later, the Supreme Court in *Sekhar v. United States* reiterated the *Scheidler* Court's definition of extortion when it held that attempting to compel a person to recommend that his employer

---

**4.** Plaintiff alleges that Defendants committed extortion under New York Penal Law § 155(2)(e). (Dkt. 11 at ¶ 28). There is no such section in the New York Penal Law; however, New York Penal Law § 155.05(e) defines larceny by extortion. The Court presumes that Plaintiff intends to allege a violation of that section.

approve an investment does not constitute "the obtaining of property from another." *Sekhar,* 133 S.Ct. at 2726. The Court noted that extortion requires the victim to "part" with property, and the extortioner to "obtain" property:

> Obtaining property requires "not only the deprivation but also the acquisition of property." That is, it requires that the victim "part with" his property, and that the extortionist "gain possession" of it. The property extorted must therefore be *transferable*—that is, capable of passing from one person to another. .
>
> .....
>
> The deprivation alleged here is ... abstract. *Scheidler* rested its decision, as we do, on the term "obtaining." The principal announced there—that a defendant must pursue something of value from the victim that can be exercised, transferred, or sold—applies with equal force here. Whether one considers the personal right at issue to be "property" in a broad sense or not, it certainly was not *obtainable property* under the Hobbs Act.

*Id.* at 2725–2726 (internal citations omitted) (emphasis in original); *see also Gotti,* 459 F.3d at 300 (noting that in *Scheidler,* the Supreme Court of the United States "clarified that for Hobbs Act liability to attach, there must be a showing that the defendant did not merely seek to deprive the victim of the property right in question, but also sought to obtain that right for himself.").

■ At oral argument, Plaintiff's counsel stressed that he went to "great lengths" to discuss the case law explaining that intangible rights qualify as property under the Hobbs Act. (Dkt. 25 at 11). It is true that "[t]he concept of property under the Hobbs Act, as devolved from its legislative history and numerous decisions, is not limited to physical or tangible property or things, but includes, in a broad sense, any valuable right considered as a source or element of wealth, and does not depend upon a direct benefit being conferred on the person who obtains the property." *United States v. Tropiano,* 418 F.2d 1069, 1075–76 (2d Cir.1969) (internal citations omitted). However, the property element is not where Plaintiff's extortion allegations fall short. Rather, Plaintiff's claims of extortion fail because he does not adequately allege that Defendants somehow *obtained property* for themselves or for another when Auberger deprived Plaintiff of certain employment conditions, or when Loszynski threatened GPD officers.

■ Plaintiff's allegation that Auberger committed extortion by not permitting Plaintiff to have a secretary, restricting the use of his police vehicle, and reducing his pay (Dkt. 11 at ¶¶ 26–28), is insufficient because there is no allegation that the property was obtained by Auberger for his benefit or that of another. Plaintiff himself alleges that Auberger hired him and restricted his benefits "solely for the purpose of doing him harm and punishing him" and "to make [his] job—and his life—impossible and miserable," (*id.* at ¶¶ 26–27), rather than to usurp these benefits for Auberger's own use. Indeed, Plaintiff does not allege that Auberger sought to take Plaintiff's wages, secretary, or police vehicle for his own use. *See United States v. Cain,* 671 F.3d 271, 282 (2d Cir.2012), *cert. denied,* — U.S. ——, 132 S.Ct. 1872, 182 L.Ed.2d 655 (2012) (satisfying *Scheidler's* requirement that the property that is the subject of the extortion be valuable in the hands of the defendant will "rarely be a problem" where the defendant "seeks to exploit the very intangible right that he extracts from the victim."); *Gotti,* 459 F.3d at 323 (noting that the "ultimate goal" of the abortion protesters in *Scheidler* was merely "shutting down a clinic that per-

formed abortions," and that this was not enough to constitute the crime of extortion). Because Plaintiff cannot allege this key element, his claim that Auberger extorted him fails.

Similarly, Plaintiff's extortion claim related to Loszynski's alleged threat to GPD officers in late 2009, fails to identify any property allegedly obtained from the officers. In other words, Plaintiff has not articulated how Defendants attempted to *obtain or obtained property to be used by* themselves or another by telling GPD officers that if they ever mentioned Auberger's name in connection with any wrongdoing, the officers would be terminated, and their benefits would be curtailed or ended. (Dkt. 11 at ¶ 34). Plaintiff does not allege that Defendants sought to obtain the officers' jobs or benefits for themselves. *See Gotti,* 459 F.3d at 324 (reasoning that in *Scheidler,* "had the protesters sought to take further action after having deprived the clinics of their right to conduct their business as they wished—by, for example, forcing the clinic staff to provide different types of services, forcing the clinic to turn its operations over to the protestors, or selling the clinic or its property to a third party—we believe that they would have satisfied the *Scheidler II* Court's definition of 'obtaining.' ").

Additionally, even if Plaintiff's claims are generously construed as alleging that Defendants attempted to obtain property in the form of control over the GPD, Plaintiff fails to allege that Defendants obtained or attempted to obtain this valuable right (i.e. control over the GPD) through the alleged extortion (i.e. Loszynski's instructing GPD officers not to say anything nega-

tive about Auberger, and Auberger's reducing Plaintiff's benefits and pay). *See Huntemann v. City of Yonkers,* No. 95 Civ. 1276(LAP), 1997 WL 527880, at *15, 1997 U.S. Dist. LEXIS 12714, at *44 (S.D.N.Y. Aug. 25, 1997) (defendant police department and officers did not commit extortion by threatening to withhold police protection if the plaintiff, a former probationary officer, was not removed from his position, because the defendants did not obtain property by the threat). Furthermore, even if Plaintiff had adequately alleged that property was obtained, he fails to allege that Plaintiff had possession of such property, or that Defendant could effectively obtain this property by terrorizing Plaintiff.[5] *See* 18 U.S.C. § 1951(b)(2) (defining extortion as *"the obtaining of property from another* ....") (emphasis added). In fact, at the time of the alleged extortion by Loszynski in late 2009, Plaintiff was no longer employed by the GPD.

Plaintiff's allegations—including the reduction of Plaintiff's benefits, Loszynski's threatening GPD officers, and any allegation that Defendants were extorting power from the GPD—more closely fit the definition coercion, which is the use of force or threat of force to restrict another's freedom of action. However, coercion does not qualify as a predicate act under RICO. *See Spiteri v. Russo,* No. 12–CV–2780 (MKB)(RLM), 2013 WL 4806960, at *48 n. 55, 2013 U.S. Dist. LEXIS 128379, at *185 n. 55 (E.D.N.Y. Sept. 7, 2013) ("The Supreme Court has found that coercion without the transfer of property or an attempt to obtain property is not extortion and not a RICO predicate act.").

---

**5.** While the Court is mindful that the federal extortion statute "references any circumstance in which property is obtained from a person with that person's consent" and that this "plainly encompasses persons holding property in a fiduciary capacity for an own-

er," *see United States v. Coppola,* 671 F.3d 220, 241 (2d Cir.2012), this is not a case where Plaintiff was allegedly holding property in trust for another individual. The GPD arguably serves the Town of Greece, not Plaintiff.

In sum, although Plaintiff makes the conclusory allegations that Defendants, by their alleged extortionate acts, wrongfully took benefits and property from an owner (Dkt. 11 at ¶¶ 28, 34), these allegations are unsupported by any facts in the amended complaint, and "a plaintiffs obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (internal quotations and citations omitted); *see also Fleming v. Hymes–Esposito*, No. 12 Civ. 1154(JPO), 2013 WL 1285431, at *11, 2013 U.S. Dist. LEXIS 45912, at *31–32 (S.D.N.Y. Mar. 29, 2013) (dismissing defendant's counterclaims for conspiracy and extortion, because they "are vague and do not rise to the required level of specificity for such allegations."). Plaintiff has failed to allege extortion as a predicate RICO act.

### B. Mail and Wire Fraud

Plaintiff alleges that Defendants committed the offenses of mail and wire fraud on or around July 28, 2010, when they released the Loszynski Report, which was "untrue," "fraudulent," and contained "untruths and falsehoods." (Dkt. 11 at ¶¶ 50–53).

▬▬▬ Where the alleged predicate acts sound in fraud, including mail and/or wire fraud, they must be pled with particularity under Fed.R.Civ.P. 9(b), and the plaintiff must allege facts giving rise to a strong inference of fraudulent intent. *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) ("On a motion to dismiss a RICO claim, Plaintiffs' allegations must also satisfy the requirement that, [i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.") (alteration in original) (internal quotations and citation omitted). Allegations failing to specify "the time, place, speaker, and sometimes even the content of the alleged misrepresentations, lack the 'particulars' required by Rule 9(b)." *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir.1986); *see also Wanamaker v. Columbian Rope Co.*, 740 F.Supp. 127, 140 (N.D.N.Y.1990) (in order to satisfy Rule 9(b), a plaintiff pleading mail and wire fraud violations must specify "[ (1) ] precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and person responsible for making (or, in the case of omissions, not making) the same, (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.") (internal quotations and citation omitted).

▬▬▬ "[T]he essential elements of a mail [or wire] fraud violation are (1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme. The mail and wire fraud statutes prohibit the use of both means of transmission in furtherance of any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir.2004) (second and third alterations in original) (internal quotations and citations omitted). "The mere fact that a statement is negative or even defamatory ... does not make it fraudulent. In order for a statement to be actionable under the mail and wire fraud statutes, a plaintiff must allege the existence of a scheme, conscious and knowing intent to defraud on the part of the speaker, and the materiality of the misrepresentation." *Li Jun An v. Hui Zhang*, No. 13 Civ. 5064(PKC),

2013 WL 6503513, at *6, 2013 U.S. Dist. LEXIS 174158, at *18–19 (S.D.N.Y. Dec. 6, 2013); *see also McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786, 791 (1st Cir.1990) ("[N]ot every use of the mails or wires in furtherance of an unlawful scheme to deprive another of property constitutes mail or wire fraud.").

Here, Plaintiff does allege the content of the alleged misrepresentations. For example, he identifies the alleged untruths in the Loszynski Report and explains why the assertions are untruthful. (Dkt. 11 at ¶ 51). However, Plaintiff fails to allege that Defendants disseminated this information with the intent to defraud money or property. Instead, Plaintiff alleges that Loszynski "did not consider all relevant evidence" in his investigation (*id.* at ¶ 49), which resonances more like negligence rather than a fraudulent criminal act. Similarly, Plaintiff fails to articulate a "scheme or artifice," and merely states that Defendants placed the allegedly false information on the internet and in the mail. As noted above, "[n]ot all conduct that strikes a court as sharp dealing or unethical conduct is a 'scheme or artifice to defraud' " as those terms are used in the mail and wire fraud statutes. *Reynolds v. E. Dyer Dev. Co.,* 882 F.2d 1249, 1252 (7th Cir.1989). Furthermore, Plaintiff fails to allege how he was misled by the statements in the Loszynski Report and what Defendants obtained as a result of the alleged fraud. Finally, because the alleged mail and wire fraud occurred in July 2010, Plaintiff is unable to establish a causal connection between these predicate acts and the termination of his employment in June 2009.

Accordingly, Plaintiff has failed to adequately allege the predicate acts of mail and wire fraud.

## C. Bribery

Plaintiff alleges in his amended complaint that Auberger committed bribery in July 2002, when he instructed Rahn to tell Plaintiff to "sign off," or remove himself from the prospective list of hires for the Deputy Chief position.[6] Plaintiff alleges that by doing so, Auberger made an implicit or explicit threat that if Rahn did not tell Plaintiff to remove himself from the Deputy Chief list, Rahn would lose his job. (Dkt. 11 at ¶ 21). As with the extortion allegations during this same time period, Plaintiff's claims of bribery from July 2002 are flawed because there was no viable enterprise in existence during this time period.[7]

Plaintiff further alleges that Auberger bribed the Greece Town Board on April

---

6. In his RICO case statement, Plaintiff alleges that Auberger's threat to Rahn constitutes the crime of extortion, rather than bribery. (Dkt. 4 at ¶ 2(a)). It is unclear whether Plaintiff's reference to extortion rather than bribery, which was alleged in his complaint, is a typographical error or mistake. The Court notes that Plaintiff's more recent filing, his amended complaint, alleges that these facts constitute bribery, and Plaintiff states in his opposition papers that Auberger's interaction with Rahn constituted bribery, rather than extortion. ·(Dkt. 21 at 9). In any event, Plaintiff's claim for either bribery or extortion is flawed because Auberger was the sole member of the enterprise in 2002.

7. Even if Plaintiff had alleged a viable enterprise, Auberger's alleged threat to Rahn does not constitute the crime of bribery, which involves *giving* someone something of value in order to influence him to act. Plaintiff's amended complaint alleges that "Auberger clearly made a threat—either directly or impliedly—that if Rahn did not do so, he would lose his job as he knows it, i.e., the conditions and authority of his employment, and such conditions and authority may be taken over from him by Auberger." (Dkt. 11 at ¶ 21). Plaintiffs allegations describe the threat of taking something away from Rahn, rather than giving him something of value.

26, 2009, when he told them, either directly or impliedly, that if they did not follow his instructions by voting to suspend Plaintiff, Rahn, and Ball, they "would not benefit from the backing of the Republican Party...." (*Id.* at ¶ 66). Auberger again allegedly bribed the Town Board on June 24, 2009, when it voted on the charges against Plaintiff. (*Id.* at ¶ 80).

Plaintiff alleges that Defendants again committed bribery when Auberger aided Loszynski in entering into an agreement with Alliance Court Reporting, wherein Alliance was not permitted to provide Plaintiff's attorney with copies of transcripts of prior compelled testimony, but provided transcripts to Loszynski. (Dkt. 4 at ¶ 2(e)).

■ Federal law defines bribery as giving or attempting to give something of value to a public official to influence an official act, commit fraud, or to omit any act in violation of his lawful duty, or for a public official to demand something of value to do the same. 18 U.S.C. § 201.[8] Under federal law, bribery requires a "quid pro quo," or a "specific intent to give or receive something of value *in exchange* for an official act." *United States v. Sun–Diamond Growers,* 526 U.S. 398, 404–05, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999). Under New York law, a "person is guilty of bribery in the third degree when he confers, or offers or agrees to confer, any benefit upon a public servant upon an agreement or understanding that such public servant's vote, opinion, judgment, action, decision or exercise of discretion as a public servant will thereby be influenced." N.Y. Penal Law § 200.00.

■ As an initial matter, Plaintiff's federal bribery claim fails because "[p]ursuant to 18 U.S.C. § 201 (bribery of a public official), the person receiving the alleged bribe must be a *federal* official as defined in 18 U.S.C. § 201(a)(1)." *Laverpool v. New York City Transit Auth.,* 760 F.Supp. 1046, 1058 (E.D.N.Y.1991) (emphasis in original); *see also* 18 U.S.C. § 201(a)(1) (defining the term "public official" to be a federal official). Here, the officials alleged to have received bribes are the Greece Town Board and Alliance Court Reporting. Neither of these entities qualifies as a federal official. Any RICO act allegedly committed pursuant to 18 U.S.C. § 201 therefore fails for this reason.

■ With regard to Auberger's alleged bribery of the Town Board, Plaintiff alleges that Auberger's mere presence at the April 26, 2009, and June 24, 2009, meetings resulted in bribery of the Town Board. (Dkt. 11 at ¶¶ 65–69, 80). Plaintiff alleges that there was some "direct or implied" communication between Auberger and the Town Board members, but he does not describe any such communication. (*Id.* at ¶ 67, 80). Plaintiff's bribery allegations against Auberger relating to an alleged "communication" between himself and the Town Board fall woefully short of the pleading standard and lack the factual support to constitute a sufficiently alleged predicate act. Plaintiff relies heavily on his subjective belief that Auberger's presence at the meeting intimidated the Town Board, and constituted a communication between Auberger and the Town Board members that if they did not vote to sus-

---

**8.** Plaintiff does not identify in his amended complaint or in his RICO case statement the specific section of the federal bribery statute, 18 U.S.C. § 201, he alleges was violated. For instance, the Court recognizes that 18 U.S.C. § 666 also proscribes bribery under federal law. However, 18 U.S.C. § 666 is not a RICO racketeering activity as defined in 18 U.S.C. § 1961(1)(B). Therefore, Plaintiff must allege a federal bribery allegation pursuant to 18 U.S.C. § 201.

pend Mackin, Rahn, and Ball, they would not receive political support from the Republican party. The Court has found no case law supporting Plaintiff's apparent contention that summarily alleging that there must have been some communication satisfies the pleading standard. To the contrary, "[w]ithout additional factual allegations—at a minimum, an allegation of some communication between [the defendants] ... indicating an agreement to [engage in the act constituting bribery] ...— [the plaintiff] ... has not 'nudged his claims ... across the line from conceivable to plausible.'" *Kaye v. D'Amato*, 357 Fed. Appx. 706, 713–14 (7th Cir.2009) (citation omitted); *see also Roberto's Fruit Mkt. v. Schaffer*, 13 F.Supp.2d 390, 399 (E.D.N.Y. 1998) (plaintiff's allegations of bribery were insufficient, because the allegations were nothing more than "vague, general and conclusory ....") (quoting *Zigman v. Giacobbe*, 944 F.Supp. 147, 156 (E.D.N.Y. 1996)); *People v. Canepa*, 295 A.D.2d 247, 248, 745 N.Y.S.2d 153 (1st Dep't 2002) (New York's bribery statute requires an "agreement" or "understanding," that "'in the mind of the bribe maker that the bribe receiver would effectuate the proscribed corruption of public process and was affected to do so by the *actus reus* of this particular crime.'") (citation omitted).

Similarly, Plaintiff's allegations regarding an alleged agreement with Alliance Court Reporting fall short of the pleading standard articulated by *Twombly*. For example, Plaintiff does not allege even a single communication between Defendants and Alliance that would support a reasonable inference of an illicit agreement. *See Kaye v. D'Amato*, 357 Fed.Appx. at 713 (affirming district court's dismissal of plaintiff's bribery allegations where the plaintiff made no factual assertions that reasonably supported an inference of bribery, including that the plaintiff failed to allege a communication between two de-

fendants supporting a reasonable inference of an illicit agreement).

Furthermore, Plaintiff's allegations that Alliance Court Reporting and the Town Board received a benefit as a result of the purported bribery are either non-existent or conclusory. While the terms "anything of value" and "benefit" are defined broadly, *People v. Garson*, 6 N.Y.3d 604, 612–13, 815 N.Y.S.2d 887, 848 N.E.2d 1264 (2006), Plaintiff does not allege that Defendants gave anything to those entities allegedly bribed, i.e., the Greece Town Board or Alliance Court Reporting. *People v. Feerick*, 93 N.Y.2d 433, 446–47, 692 N.Y.S.2d 638, 714 N.E.2d 851 (1999) ("benefit" includes more than financial gain and can encompass political or other types of advantage); *see also People v. Cavan*, 84 Misc.2d 510, 376 N.Y.S.2d 65, 66 (Sup.Ct., Queens Cnty. Sept. 22, 1975) ("the benefit must not be so remote, abstract, or theoretical as to create speculation as to its ultimate value to the receiver.").

With respect to the Town Board, Plaintiff does not allege that any benefit was promised. Rather, at best, he alleges that there was the threat of withdrawal of political support (although again, allegations regarding any communications or agreements in this regard are non-existent). With respect to Alliance Court Reporting, Plaintiff does not identify the benefit received by Alliance, or who or what was in receipt of the same. Instead, Plaintiff alleges that Defendants entered into an agreement with Alliance Court Reporting such that Alliance was not permitted to provide Plaintiff with transcripts of his prior testimony. (Dkt. 4 at ¶ 2(e)). Plaintiff fails to articulate the benefit that was received by this alleged agreement.

Accordingly, Plaintiff has failed to allege any predicate act of bribery.

For those reasons, Plaintiff has failed to allege any predicate act, and his RICO claims are therefore dismissed.[9]

## VI. RICO Conspiracy Pursuant to 18 U.S.C. § 1962(d)

Plaintiff also alleges that Defendants violated 18 U.S.C. § 1962(d) by conspiring to commit RICO violations. Defendants argue that Plaintiff has failed to allege a conspiracy under § 1962(d) because he has not pled an agreement to commit at least two predicate acts. (Dkt. 22 at 8).

 "[T]he Second Circuit has instructed a plaintiff must [allege] ... that (i) the defendants agreed to form and associate themselves with a RICO enterprise; (ii) the defendants agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise; and (iii) if the agreed-upon predicate acts had been carried out, they would have constituted a pattern of racketeering activity." *Elsevier, Inc. v. Grossman*, 2013 WL 6331839, at *11, 2013 U.S. Dist. LEXIS 171701, at *34 (citing *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244–45 (2d Cir.1999)). As to the "agreement" requirement, "[b]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir.1990). "Although a plaintiff is not subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) in pleading a RICO conspiracy, a RICO conspiracy claim 'should be more than a conclusory add-on at the end of a complaint.'" *Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F.Supp.3d 207, 230 (E.D.N.Y.2014) (quoting *FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F.Supp.2d 362, 373 (E.D.N.Y.2002)) (internal citation omitted). "[A] defendant violates section 1962(d) when he or she enters into an agreement with knowledge that the goal of the conspiracy is the commission of a RICO violation, that is to 'conduct or participate in the affairs of an enterprise through a pattern of racketeering activity.'" *United States v. Neapolitan*, 791 F.2d 489, 492 (7th Cir.1986); *see also United States v. Basciano*, 599 F.3d 184, 199 (2d Cir.2010).

It appears unsettled whether a civil RICO conspiracy claim is dependent on the plaintiff successfully alleging a substantive civil RICO offense. *See D. Penguin Bros. v. City Nat'l Bank*, 587 Fed. Appx. 663, 669, No. 14–1056–cv, 2014 WL 5293242, at *5, 2014 U.S.App. LEXIS 19909, at *12–13 (2d Cir. Oct. 16, 2014) ("plaintiffs have failed to state a claim for relief under § 1962(c) of the RICO statute.... The failure to state a claim for a substantive RICO violation, moreover, is fatal to plaintiffs' RICO conspiracy claim under § 1962(d)"); *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir.1993) ("Any claim under section 1962(d) based

---

9. Even if Plaintiff adequately pled some the alleged predicate acts, he is unable to demonstrate continuity. *See Kaye v. D'Amato*, 2008 WL 5263746, at *12, 2008 U.S. Dist. LEXIS 104655, at *39 (E.D.Wis. Dec. 18, 2008) ("In sum, Kaye has only sufficiently alleged two predicate acts. In the final analysis, these two allegations of extortion amount to isolated events that, while perhaps related, certainly do not begin to demonstrate any kind of continuity, and clearly do not amount to a pattern of racketeering. Indeed, even if all of Kaye's allegations were sufficiently pled, he still would not have met the continuity requirement, and his allegations would remain ripe for dismissal."). This is particularly the case given the non-existence of more than one person acting as part of the scheme until Loszynski was hired in May 2009, and the termination of Plaintiff's employment just a couple months later in June/July 2009. (Dkt. 11 at ¶¶ 31, 78–79).

on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient."); *Discon, Inc.*, 93 F.3d at 1064 ("Since we have held that the prior claims do not state a cause of action for substantive violations of RICO, the present [conspiracy] claim does not set forth a conspiracy to commit such violations."); *cf., United States v. Applins,* 637 F.3d 59, 73–75 (2d Cir.2011) (interpreting the United States Supreme Court decision of *Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), as rejecting the proposition that a conviction for RICO conspiracy requires proof that a § 1962(c) violation was committed, and stating that the establishment of an enterprise is not an element of the RICO conspiracy offense). Therefore, although it has already been determined that Plaintiff has not adequately pled the existence of an enterprise as defined by the substantive RICO statute (*see* Part IV of this Decision and Order), the Court will proceed with a separate analysis of Plaintiff's conspiracy claim pursuant to 18 U.S.C. § 1962(d).

■ Here, Plaintiff does not allege specifically that Defendants Auberger and Loszynski had a meeting of the minds to commit predicate RICO acts, and Plaintiff's general allegations that Auberger and Loszynski "conspired" to commit RICO violations are conclusory. (Dkt. 11 at ¶ 87 and Dkt. 4 at ¶¶ 14(a)-(d)). In fact, Loszynski was not even hired until May 2009 and, therefore, there could not have been any meeting of the minds with regard to any of the alleged predicate acts before that time.

■ Even if Plaintiff had alleged a meeting of the minds between Defendants to commit acts against Plaintiff, Plaintiff's RICO conspiracy claim must fail because the alleged acts that Defendants agreed to commit do not amount to criminal activity,

or RICO predicate acts. In *Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), the United States Supreme Court found that "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Id.* at 65, 118 S.Ct. 469. Because the alleged "endeavor" of Defendants did not involve the commission of any criminal offense (*see* Part V of this Decision and Order), Plaintiff cannot allege a RICO conspiracy. *See Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,* 85 F.Supp.2d 282, 303 (S.D.N.Y.2000), *aff'd,* 2 Fed.Appx. 109 (2001) (dismissing plaintiff's RICO conspiracy claim after finding that plaintiff failed to allege the predicate act of mail and wire fraud, because "[w]here a RICO conspiracy claim is based on predicate acts that have been dismissed by the court, the conspiracy claim 'must be dismissed as well.'") (citation omitted); *Lakonia Mgmt., Ltd. v. Meriwether,* 106 F.Supp.2d 540, 557–58 (S.D.N.Y.2000) (same).

A RICO conspiracy claim contemplates planned or failed criminal offenses, not non-criminal acts like those allegedly engaged in by Defendants. Accordingly, Plaintiff has failed to state a claim for conspiracy to commit a RICO violation under 18 U.S.C. § 1962(d).

### VII. RICO Standing

Defendants argue that Plaintiff does not have standing to bring his RICO claims. (Dkt. 13–2 at 22–24). Specifically, Defendants argue that Plaintiff has failed to plead the causation requirement of RICO standing, because Plaintiff has not alleged that Defendants' RICO violations were a proximate cause of the loss of Plaintiff's job and reputation. (*Id.*).

■ The RICO statute grants standing to "[a]ny person injured in his business or property by reason of a violation of section 1962...." 18 U.S.C. § 1964(c). To allege standing, a plaintiff must plead, "(1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation." *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 380 (2d Cir.2001). "Central to the notion of proximate cause [under RICO] is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were a substantial factor in the sequence of responsible causation, and whose injury was reasonably foreseeable or anticipated as a natural consequence." *McRae v. Norton*, No. 11–CV–2707 (KAM)(SMG), 2011 WL 3625569, at *2, 2011 U.S. Dist. LEXIS 89922, at *7 (E.D.N.Y. Aug. 11, 2011) (alteration in original) (internal quotations and citation omitted). "The Second Circuit has carefully addressed the causation element due to the proliferation of creative pleading by plaintiffs who seek to take advantage of RICO's generous remedies.... Specifically, a plaintiff must show that his injury was caused by a pattern of racketeering activity violating section 1962 or by individual RICO predicate acts." *Hall v. Tressic*, 381 F.Supp.2d 101, 111 (N.D.N.Y.2005) (internal quotations and citation omitted).

■ Not all injuries qualify as RICO injuries. Injuries that are too speculative or lack the requisite proximate cause do not satisfy the RICO standing requirement. "[C]ourts regularly have held that a plaintiff who alleges injuries that are 'indefinite and unprovable' does not have standing under, and cannot recover damages pursuant to, RICO." *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,

530 F.Supp.2d 486, 521 (S.D.N.Y.2007), *aff'd*, 328 Fed.Appx. 695 (2d Cir.2009). Additionally, personal injuries are not injuries to business or property as those terms are used in the RICO statute. *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 241 (2d Cir.1999); *see also Zimmerman v. Poly Prep Country Day Sch.*, 888 F.Supp.2d 317, 329 (E.D.N.Y.2012) ("It is beyond dispute that personal injuries are not injuries to 'business or property.' ").

Plaintiff identifies three injuries allegedly caused by Defendants' RICO violations:

(1) Plaintiff's loss of career, livelihood, reputation, and ability to gain future employment;

(2) the Town of Greece's loss of over $900,000 as a result of the generation of the Loszynski report; and

(3) the hiring of Gary Pignato by Auberger, after alterations of Pignato's background investigation, resulting in sexual assaults against women and lawsuits against the Town of Greece.

(Dkt. 4 at ¶ 15(a-c)).

Defendants argue that injury theories claimed to result from frauds perpetrated on non-parties have been discredited by the United States Supreme Court and the Second Circuit Court of Appeals, and have been held insufficient to establish proximate cause as a matter of law. (Dkt. 13–2 at 22–23). They cite *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006), and *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir.2003), both holding that compensable RICO damages must flow directly from the commission of the predicate RICO acts themselves, and cannot be the result of an intermediary's actions that may have been induced or caused by the alleged RICO activity. (Dkt. 13–2 at 22–23).

■ The alleged injures regarding Greece's loss of over $900,000 and the hiring of Gary Pignato are not viable injuries recoverable by Plaintiff under the RICO statute, since they are injuries to third parties and do not involve an injury to Plaintiff's business or property. *See Rand v. Anaconda–Ericsson, Inc.,* 794 F.2d 843, 849 (2d Cir.1986) (shareholders of corporation lack standing to assert RICO claim against corporation's creditors on behalf of corporation because "[t]he legal injury, if any, was to the firm."); *Leung v. Law,* 387 F.Supp.2d 105, 123 (E.D.N.Y.2005) (dismissing the plaintiff's RICO claims where "the direct injuries incurred by the defendants' RICO predicate acts, if any, were suffered by persons or entities other than [the plaintiff] . . ., and [the plaintiff] . . . lacks standing to raise any of his various civil RICO claims.").

■ Plaintiff also alleges that he was injured by the loss of his career, livelihood, reputation, and ability to obtain future employment.[10] (Dkt. 4 at ¶ 15(a)). The Court is uncertain as to what Plaintiff means by "loss of career," but notes that this alleged injury appears speculative and indefinite. Furthermore, the loss of Plaintiff's reputation and resulting inability to gain future employment are personal injuries and are not compensable under RICO. *Gilfus v. Vargason,* No. 5:04–CV–1379 (HGM/DEP), 2006 WL 2827658, at *8–9, 2006 U.S. Dist. LEXIS 74037, at *26–28 (N.D.N.Y. Sept. 30, 2006); *see also Hollander v. Flash Dancers Topless Club,* 340 F.Supp.2d 453, 459 (S.D.N.Y.2004), *aff'd,* 173 Fed.Appx. 15 (2d Cir.2006) (explaining

that damages to plaintiff's "business reputation and goodwill" are not the type of injuries to business or property actionable under RICO); *Tsipouras v. W & M Props., Inc.,* 9 F.Supp.2d 365, 368 (S.D.N.Y.1998) (injury to character and business reputation not actionable under civil RICO); *Roitman v. New York City Transit Auth.,* 704 F.Supp. 346, 348–49 (E.D.N.Y.1989) (damage to a plaintiffs reputation and resulting inability to secure employment was personal injury as opposed to a property injury); *Mack v. Parker Jewish Inst. for Health Care & Rehab.,* No. CV 14–1299, 2014 WL 5529746, at *6, 2014 U.S. Dist. LEXIS 154577, at *13–14 (E.D.N.Y. Oct. 30, 2014) (plaintiffs inability "to seek employment that reflects her level of professional achievement and standing within her field, or to further her career" is not a cognizable injury under RICO, and simply alleging an inability to find employment reflective of education and experience is "too speculative to constitute an injury to business or property.").

Accordingly, Plaintiff has failed to adequately allege statutory standing under RICO.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted pursuant to Fed.R.Civ.P. 12(b)(6), and Plaintiff's amended complaint is dismissed in its entirety.

SO ORDERED.

---

10. Although it is not specifically identified by Plaintiff as part of his alleged RICO injuries (Dkt. 4 at ¶ 15), to the extent Plaintiff alleges that he lost his job as Deputy Chief of the GPD due to Defendants' bribery of the Town Board (Dkt. 11 at ¶¶ 68, 80), as noted by the Court in Part V(C) of this Decision and Order, Plaintiff has failed to plausibly allege the predicate act of bribery. Therefore, he is unable to allege proximate cause as to this injury, and the Court declines to reach a conclusion as to whether Plaintiff's loss of his position as Deputy Chief is a viable RICO injury under these circumstances.